IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENOBIA HUEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-2861-P (BH) |
| | § | |
| CAROLYN COLVIN, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact and recommendation. Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits*, filed November 26, 2014 (doc. 15), *Defendant's Response Brief*, filed January 15, 2015 (doc. 18), and *Plaintiff's Reply to the Commissioner's Response Brief*, filed February 4, 2015 (doc. 19). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED,** and the case should be **REMANDED** for further administrative proceedings.

### I. BACKGROUND[1]

**A. Procedural History**

Zenobia Huey (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. (R. at 23.) On

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

August 1, 2011, she applied for disability and disability insurance benefits. (R. at 171-72.) On August 25, 2011, she also applied for supplemental security income. (R. at 171-79.) In both applications, she alleged disability beginning October 26, 2007. (*Id.*)[2] Her application was initially denied on December 21, 2011. (R. at 23.) Upon reconsideration, she was approved with an established onset date of July 1, 2011, but not for the onset date Plaintiff identified. (*Id.*) She timely requested a hearing before an Administrative Law Judge (ALJ) and personally appeared and testified at a hearing on February 28, 2013. (*See* R. at 24, 118, 121.) On April 3, 2013, the ALJ issued his decision finding Plaintiff not disabled. (R. at 20-34.) The Appeals Council denied her request for review on July 25, 2013, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4.) Plaintiff timely appealed to the United States District Court pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.   Factual History**

    **1.   Age, Education, and Work Experience**

Plaintiff was born on November 6, 1955, and she was 57 years old at the time of the hearing before the ALJ. (R. at 48.) She received a high school diploma and earned enough credits for an associate degree in college, but no degree was conferred. (R. at 50.) Plaintiff had past relevant work as a dispatcher. (R. at 63.)

    **2.   Medical, Psychological, and Psychiatric Evidence**

On October 2, 2007, Plaintiff was taken to UT Health Center in Tyler by her husband for slurred speech and right facial droop. (R. at 313.) Her blood pressure was 160/122. (*Id.*) A CT Scan was essentially negative for any acute infarct. (*Id.*) Plaintiff's symptoms reportedly improved

---

[2]   Plaintiff and the ALJ identified different application dates. (doc. 15 at 7.)

within an hour after her arrival at UT Health Center; her speech returned to normal and her facial droop resolved. (*Id.*) She was then transferred to Mother Frances Hospital for a neurological evaluation. (*Id.*)

At Mother Frances Hospital, Plaintiff had an MRI/MRA of her brain, TEE, and transthoracic echocardiogram . (R. at 313, 330.)  An MRI showed acute right frontal lobe infarct. (*Id.*)  A psychiatric examination revealed that her judgment was intact; she was oriented to time, place, and person; her memory was intact for recent and remote events; and she was moderately anxious. (R. at 325.)  Plaintiff's neurological consultation report noted a long history of untreated hypertension. (R. at 336.)  Plaintiff was discharged from Mother Frances Hospital on October 5, 2007, with a diagnosis of acute right frontal lobe infarct now recovered; accelerated hypertension; non q-wave myocardial infarction with ischemic cardiomyopathy, ejection fraction 20% and wall motion abnormalities; anemia likely of chronic disease; anxiety and depression; and history of fibroids. (R. at 330.)  At discharge, Plaintiff's blood pressure was 139/77. (*Id.*)  She was instructed to follow up with her primary care physician, Dr. Brian Lowery, M.D., as well as with Dr. Sherif Iskander, M.D., for a cardiac catheterization, and Dr. Eric Drew, M.D., regarding neurology. (R. at 331.)

On October 27, 2007, Plaintiff saw Dr. Iskander regarding her episode of congestive heart failure. (R. at 372.)  She reported being significantly better, but complained of shortness of breath with mild to moderate exertion and lower extremity edema. (*Id.*)

Plaintiff returned to Dr. Iskander again on December 19, 2007, chiefly complaining of shortness of breath. (R. at 367.)  She reported that her symptoms worsened with activities of daily living. (*Id.*)

On January 14, 2008, an adenosine myocardial perfusion study revealed abnormal adenosine

myocardial perfusion position, consistent with a dominant non-ischemic cardiomyopathy with a small-to-moderate defect in the apex. (R. at 355.)

On February 7, 2008, Plaintiff returned to Dr. Iskander for palpitations and shortness of breath. (R. at 362.) Her palpitations generally lasted twenty minutes and occurred three times a week. (*Id*.) Plaintiff described the palpitations as rare, skipped beats that occurred randomly but were made worse with exercise, anxiety, and stress. (*Id*.) Her blood pressure was 140/90 in the sitting position. (R. at 363). Dr. Iskander's impression was idiopathic cardiomyopathy and chronic combined systolic/diastolic heart failure - suboptimal control on medical therapy. (R. at 364.) He recommended an echocardiogram and increased Plaintiff's Prinivil and Atenolol. (*Id*.)

Plaintiff went to East Texas Medical Center for a transthoracic echocardiogram on April 22, 2008. (R. at 394.) The test showed mild concentric left ventricular hypertrophy with an ejection fraction of 35-40%. (R. at 395.) The findings also showed a transmittal spectral Doppler flow pattern that was suggestive of impaired left ventricular relaxation. (*Id*.)

Plaintiff returned to Dr. Iskander on October 16, 2008, and reported feeling "great" with only a few minutes of shortness of breath when she turned on her left side during the night. (R. at 683.) Her blood pressure was 130/78 in the sitting position. (R. at 684.)

On July 20, 2011, Plaintiff was admitted to the emergency room at UT Health Science Center in Tyler with a complaint of altered mental status. (R. at 404.) She had slurred speech, unsteady gait, and an inability to answer questions appropriately. (*Id*.) Her blood pressure was 139/88, and a CT of the head showed changes from the scan in 2007. (R. at 405.) Plaintiff was transferred to Trinity Mother Frances. (*Id*.)

Plaintiff was admitted to Trinity Mother Frances on July 21, 2011. (R. at 436.) She had

4

sepsis, liver failure, and renal failure. (*Id.*)  The next day, she had profound left-side weakness, aphasia, and right gaze deviation, which prompted a consultation for stroke. (*Id.*)  Plaintiff's neurological exam revealed that she was oriented to person, place, year, and president, but that her remote and recent memory was impaired. (R. at 437.) An echocardiogram on July 22, 2011, showed an ejection fraction estimated to be below 20%, left ventricular thrombus, severely reduced systolic function, moderate mitral regurgitation, severe tricuspid regurgitation, and elevated right ventricular systolic pressure. (R. at 450.) Plaintiff's radiology service report found an enlargement of the heart, mild pulmonary vascular engorgement, and increased density in the left lower lobe. (R. at 513.)  Dr. Iskander recommended full anticoagulation. (R. at 440.)  Plaintiff was discharged on July 30, 2011, and told to follow up with her cardiologist within two weeks. (R. at 432.)

Plaintiff returned to the UT Health Science Center of Tyler emergency room on October 28, 2011, for high blood pressure. (R. at. 828.)  Her blood pressure was 218/114. (R. at 829.)  It was gently lowered there, and she was encouraged to follow up with her cardiologist within two days for further evaluation and treatment. (*Id.*)

Plaintiff was referred for a psychological evaluation by the Disability Determination Services, and it was conducted by Sandy Caldwell-Harper, Ph.D., on November 22, 2011.  (R. at 765-71.)  Plaintiff was able to borrow a friend's car to get to the appointment. (R. at 765.)  She reported fleeting suicidal thoughts with an attempt in 2007, and said she was sad and isolated due to her fear of another heart attack. (R. at 767.) Dr. Caldwell-Harper found that Plaintiff had no impairment in her self-perception; that she was fully oriented to person, place, and time; and that her remote memory skills appeared to be intact. (*Id.*) Her overall level of general intelligence was designated as deficient, and her verbal IQ and performance IQ were also reported in the deficient

5

range. (*Id.* at 769.) Her recent and immediate memory skills were not intact. (*Id.*) Dr. Caldwell-Harper assigned a Global Assessment of Functioning of 50-55 at the time of the test, and concluded that Plaintiff appeared to be experiencing significant symptoms of major depression. (R. at 771.) Dr. Caldwell-Harper deferred making a medical prognosis to a medical doctor. (*Id.*)

On February 24, 2012, Dr. Iskander completed a medical source statement for Plaintiff. (R. at 813.) He identified her symptoms as shortness of breath, fatigue, weakness, and edema, and diagnosed cardiomyopathy and hypertension. (*Id.*) He found her incapable of even low stress jobs. (*Id.*)

Dr. Iskander completed a second medical source statement for Plaintiff on May 12, 2013, diagnosing her with Class III heart disease with a poor prognosis. (R. at 1252.) He identified symptoms of fatigue, edema, shortness of breath, and weakness. (*Id.*) Dr. Iskander found that Plaintiff was incapable of even low stress jobs; she could stand/walk for less than 2 hours, sit for up to 2 hours, and lift less than 10 pounds occasionally. (*Id.*) He also recommended that Plaintiff elevate her legs at a sedentary job. (*Id.*) Finally, he reported that the earliest date of symptoms and limitations was July 22, 2011. (R. at 1255.)

    **3.**     **Hearing Testimony**

On February 28, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 42-68.) Plaintiff was represented by an attorney. (R. at 42.)

    *a.*     *Plaintiff's Testimony*

Plaintiff testified that she was 57 years old, 5 feet 5 inches tall, weighed about 170 pounds, and lived alone. (R. at 48-49.) She was right-handed. (R. at 48). She had not had a driver's license since 2007. (R. at 49.)

6

Plaintiff graduated from high school and obtained enough credits to earn an associate degree in college, but was not awarded one. (R. at 50.)  Between the late 1980s and October 2007, she worked as a customer service/dispatcher for a cable TV company. (R. at 51.)  She obtained work at some point in 2008 and 2009 with "[l]ighter duties but basically the same titles." (*Id*.)

Plaintiff left her most recent job because she "was missing considerable amount of days and being late and [she and her supervisor] [came] to the agreement that the responsibility of that job was too much for [her]." (R. at 53.)  "[She] was fatigued, exhausted, and [she] couldn't function on the normal basis that [she] used to when [she] was working." (*Id*.)

Her previous strokes left her very fatigued, with anxiety, loss of appetite, agitation, crying spells, withdrawal, and a desire to not be around people. (R. at 54.)  After the stroke in 2007, "[t]he fatigue mostly took over from the time [she] got up in the morning 'til the late afternoon and . . . [she] couldn't just remember what [she] was supposed to do or how to do it." (R. at 58.)  She was subsequently unable to do any housework. (R. at 60.)  She tried to do a little housework, but it exhausted her and made her lay down and sleep until she felt that she could get back up. (*Id*.)  She also lost her balance and felt like she was going to faint when she went for a walk. (*Id*.)  Plaintiff was unable to go grocery shopping by herself. (*Id*.)  She tried to do it but got confused, so a friend had done her shopping for her since 2010 and 2011. (*Id*.)

After the stroke in 2007, Plaintiff had problems understanding and remembering what she was told. (R. at 56.)  She also repeated herself in conversation, answered questions multiple times, and sometimes put her clothes on backwards. (R. at 58-59.)  She developed depression and would experience stomach pains and migraine headaches. (*Id*.)

Plaintiff liked to watch Court TV, a lot of news, and a couple of reality shows. (R. at 55.)

7

Back in 2010 and 2011, she watched a lot of CNN and CSPAN because "[she] loved history and [she] wanted to keep up with everything that was going on." (*Id*.) She was able to understand and follow what was occurring on CNN and CSPAN before the stroke, but after the stroke she was not able to always understand what was happening on the TV programs she watched. (R. at 56-57.)

### C. VE's Testimony

The VE testified that Plaintiff had past relevant work as a dispatcher (913.167-010, sedentary, semi-skilled, SVP:5), and that she performed her job at this level. (R. at 63-64.) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work history, and who could do full range of sedentary work, could perform Plaintiff's past relevant work. (*Id*.) The VE responded in the affirmative. (*Id*.)

Plaintiff's attorney then asked the VE to opine whether a hypothetical person who was unable to maintain attention and concentration for at least two hours of time would be able to perform and maintain Plaintiff's past relevant work, or any other work in the national economy. (*Id*.) The VE testified that the hypothetical person could not maintain competitive work. (R. at 65-66.)

In response to Plaintiff's attorney's question about the tolerance for missing work, the VE testified that the tolerance for missing work was "No more than two days per month." (R. at 66.) Any more than two days could result in termination. (*Id*.) When asked whether a hypothetical person who was unable to perform detailed or complex tasks would be able to perform Plaintiff's past relevant work, the VE responded in the negative. (*Id*.) When the hypothetical was modified to reflect an individual who was limited to a sedentary RFC in simple work, the VE testified that such a person would also not be able to perform the work. (*Id*.)

The VE was next asked to opine whether a hypothetical person who was unable to sustain

8

an ordinary routine without special supervision would be able to perform Plaintiff's past relevant work. (*Id.*) The VE testified that such a person would not be able to perform Plaintiff's past relevant work. (*Id.*) The hypothetical was modified to a person who cannot complete an eight-hour work day on a 40 hour work week on a regular and continuing basis, and the VE testified that such a person would also not be able to perform the work. (*Id.*)

**C.     ALJ's Findings**

The ALJ issued his decision denying benefits on April 3, 2013. (R. at 23-34.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since October 26, 2007. (R. at 26.) At step two, he found that Plaintiff had the following severe impairments: cardiomyopathy, atrial fibrillation, and history of stroke. (*Id.*) At step three, he found that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in the regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a). (R. at 29.)

At step four, based on the VE's testimony, the ALJ determined that Plaintiff was capable of performing past relevant work as a dispatcher because the work did not require the performance of work-related activities precluded by her RFC. (R. at 33.) He therefore concluded that Plaintiff was not disabled at any time between her alleged onset date and the date of the ALJ's decision. (*Id.*)

**D.     New Evidence Submitted to the Appeals Council**

Plaintiff appealed the ALJ's decision to the Appeals Council on July 3, 2013. (R. at 8-9.) She submitted a cardiac RFC questionnaire from Dr. Iskander dated May 12, 2013. (R. at 1251-55.) It provided additional restrictions and limitations beginning July 22, 2011. It found that Plaintiff

9

was "[i]ncapable of even 'low stress' jobs." (R. at 1252.)

On June 25, 2014, the Appeals Council denied Plaintiff's request for review, explaining that it had considered her new evidence but "the additional evidence does not provide a basis for changing the Administrative Law Judge's decision." (R. at 2.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding

11

        of "not disabled" must be made.

    5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    **Issue for Review**

    Plaintiff presents three issues for review:

    1.      Does substantial evidence support the ALJ's finding that [Plaintiff] could perform her past work based on VE testimony that mistakenly characterized the work as "sedentary" when the DOT classifies it as "light"? If not, is an award of benefits necessary when a step five analysis would have found [Plaintiff] disabled under the Medical Vocational Guidelines?

      2.      Did the ALJ impermissibly substitute his lay opinion for that of [Plaintiff's] treating and examining physicians who reported non-exertional limitations in maintaining attention and concentration that the ALJ omitted from his RFC finding?

      3.      Does a new opinion statement from [Plaintiff's] treating physician constitute new and material evidence where it was admitted into the record and concerned [Plaintiff's] exertional limitations prior to the ALJ's decision? If so, does the opinion dilute the record when it reports more significant exertional limitations than the ALJ found in his determination?

**C.**    <u>**Issue One: Past Relevant Work**</u>

Plaintiff contends that the ALJ relied on erroneous VE testimony that conflicted with the classification in the Dictionary of Occupational Titles (DOT) of her past work without resolving the conflict between the two in violation of SSR 00-4p and SSR 82-62. (doc. 15 at 9, 15-18.)

The DOT and its supplement, the Selected Characteristics of Occupations (SCO) defined in the Revised DOT, "comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Veal v. Soc. Sec. Admin.*, 618 F.Supp.2d 600, 608–09 (E.D. Tex. 2009); *see Conaway v. Astrue*, No. 3:07–CV–0906–BD, 2008 WL 4865549, at *5 (N.D. Tex. Nov. 10, 2008) ("The DOT was promulgated by the Department of Labor to provide 'standardized occupational information to support job placement activities'. . . . [and] contain descriptions of the requirements for thousands of jobs in the national economy.") (internal citations omitted); *see Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

      *1.*    *Conflict with DOT*

Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00–4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. SSR 00–4p, 2000 WL 1898704 (S.S.A. 2000). SSRs represent

13

"statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration. 20 C.F.R. § 402.35(b)(1). While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n. 9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel,* 238 F.3d 617, 620 (5th Cir. 2001) (per curiam). However, courts may "rel[y] upon the rulings in evaluating ALJs' decisions." *Myers*, 238 F.3d at 620.

SSR 00–4p establishes the ALJ's affirmative duty to bring to light and explain any "apparent unresolved conflict" between the VE's testimony and the DOT. *Id.* As part of his duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency. *Id.* at *4. The ALJ must also explain in the decision how any identified conflict was resolved. *Id.* Neither the DOT nor VE testimony automatically trumps when there is a conflict. *Id.* at *2; *Siller v. Barnhart*, No. SA–04–CA–0514 FBNN, 2005 WL 1430361, at *7–8 (W.D. Tex. June 17, 2005) (finding that neither the DOT nor VE testimony should automatically be accorded controlling weight). Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT, however. SSR 00–4p, 2000 WL 1898704, at *2. A claimant is not required to raise the issue of any discrepancy at the hearing. *Romine v. Barnhart*, 454 F.Supp.2d 623, 627–28 (E.D. Tex. 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735–3 6 (7th Cir. 2006)).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT.

*See Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities. *See id.* at 146-47. Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *See id.*

In this case, the ALJ considered the VE's testimony and the DOT in determining Plaintiff's past relevant work and whether an individual with Plaintiff's residual functional capacity could perform her past relevant work. (*See* R. at 33.) The VE identified Plaintiff's DOT job title as "dispatcher," 913.167-101. (R. at 63-64.) The VE further identified dispatcher as "sedentary, semi-skilled, SVP 5." (R. at 64.) The ALJ's hypothetical to the VE was based on dispatcher being a sedentary job and Plaintiff being able to perform sedentary work. (*See* R. at 64-65.)

In the DOT, 913.167-101 Bus Dispatcher, Interstate, is described as:

*STRENGTH: Light Work* - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. *Physical demand requirements are in excess of those for Sedentary Work*. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

*See* Dep't of Labor, D.O.T. 913.167-101, 1991 WL 687818 (G.P.O. 1991) (emphasis added). The VE's testimony directly conflicted with the DOT because she testified the position was sedentary, rather than light work. The DOT description classifies dispatcher as "Light Work" and further states that "Physical demand requirements are in excess of those for Sedentary Work." *Id.* The ALJ had

an obligation under SSR 00–4p to resolve this conflict, but he did not.[3] (*See* R. at 23-34.)

The Commissioner contends that the VE can rely on her experience over the "general guidelines" of the DOT when testifying. (doc. 18 at 9-10.) In *Carey v. Apfel,* however, the Fifth Circuit expressed an unwillingness to defer to a VE without explanation. *See Carey*, 230 F.3d at 147. It "[a]dopt[ed] a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling." *Id*. (also stating that "a vocational expert's erroneous characterization of the exertional level or skills required to perform a particular job calls into question both the probative value and reliability of the expert's testimony."). "When a 'direct and obvious' conflict exists between the VE's testimony and the DOT and the ALJ fails to explain or resolve the conflict, the testimony is 'so lessened that reversal and remand for lack of substantial evidence usually follows.'" *Osborne v. Colvin*, No. 14–cv–1299–BN, 2015 WL 4755488, at *7 (N.D. Tex. Aug. 12, 2015) (citing *Carey*, 230 F.3d at 146; *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F.Supp.2d 607, 613 (E.D. Tex.2009)). Such a conflict existed here.

The Commissioner next contends that since Plaintiff was represented by counsel at the hearing, her counsel should have raised the conflict at the hearing and cross-examined on it. (doc. 18 at 12.) Under SSR 00–4p, however, the ALJ must explain in the decision how any identified conflict was resolved. SSR 00–4p, 2000 WL 1898704, *1–2. SSR 00–4p does not limit the ALJ's obligation to *pro se* parties. *See id*. The ALJ had the responsibility to ask about any possible conflicts between the VE's testimony and the DOT, and to resolve those conflicts. Here, the ALJ did not do so and therefore erred. (*See* R. at 23-34, 42-68.)

---

[3] Because the direct conflict between the VE's testimony and the DOT was not resolved by the ALJ in compliance with SSR 00-4p, it is unnecessary to consider whether there was also a violation of SSR 82-62.

### *2.     Harmless error*

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam).  "[P]rocedural improprieties . . . will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (per curiam) (emphasis added) (quoting *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x  at 722; *see also Webb v. Astrue*, No. 4:08-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar. 2, 2010), *adopted by*, 2010 WL 1644697 (N.D. Tex. Apr. 22, 2010 (applying harmless error analysis to the ALJ's failure to give weight to an SAMC's opinion and finding there was substantial evidence to support the ALJ's RFC determination).

The Fifth Circuit has ruled that even when the ALJ fails to discover and address conflicts between the testimony of a VE and the DOT, the claimant is not entitled to relief unless she can show that she was prejudiced by the alleged error. *DeLeon v. Barnhart*, 174 F. App'x 201, 203 (5th Cir. 2006) (per curiam) (citing *Mays*, 837 F.2d at 1364); *see, e.g., Prochaska*, 454 F.3d at 735–36 (noting that the ALJ's legal error in failing to ask about a conflict negated the claimant's responsibility to raise the issue); *Burns v. Barnhart*, 312 F.3d 113, 126–27 (3d Cir. 2002) (remanding for the ALJ to handle the conflict in accordance with SSR 00–4p).  A claimant establishes the requisite prejudice by showing that, "if the ALJ had fully developed the record,"

additional evidence would have been produced that "*might* have led to a different decision." *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (emphasis added).

Here, the ALJ's failure to adhere to SSR 00-4p prejudiced Plaintiff because the evidence that would have resulted from compliance with the ruling might have led to a difference decision. *See Jackson v. Astrue*, No. 4:11–CV–28–Y, 2011 WL 4943547, at *11-12 (N.D. Tex. Aug 23, 2011), *adopted by*, 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011); *Newton*, 209 F.3d at 458. Questions regarding the conflict could have clarified that the VE's testimony was based on Plaintiff's prior past work, as the Commissioner alleges, or that Plaintiff was incapable of working as a dispatcher. The requirement for establishing prejudice has been satisfied because it is possible that this evidence would have caused the ALJ to make a different determination regarding Plaintiff's ability to perform the job of dispatcher. That ultimate determination, however, will be made on remand after "the ALJ ha[s] fully developed the record."[4] *See id.* Accordingly, Plaintiff has demonstrated that she was prejudiced and that a substantial right has been affected.[5]

### III. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

---

[4] Plaintiff contends that the proper recourse is remand with instruction to award benefits. (doc. 15 at 18.) If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08–CV–045–C, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.' " *Id*. at *11 (citation omitted). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir.2000). Inconsistencies and unresolved issues in the record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The record in this case is insufficient to remand with instruction to award benefits.

[5] Because the ALJ did not resolve the conflict in between the VE's testimony and the DOT in making his step four determination and reversal and remand is recommended, it is unnecessary to consider Plaintiff's remaining issues.

**SO RECOMMENDED** on this 4th day of September, 2015.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE